**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TEAM KENNEDY, LIBERTARIAN PARTY OF ILLINOIS, ROBERT F. KENNEDY JR., WILLIAM REDPATH, and ANGEL OAKLEY | ) ) ) ) | |
| | ) | No. 24-cv-7027 |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | Hon. John Kness |
| ILLINOIS STATE BOARD OF ELECTIONS, and, BERNADETTE MATTHEWS, in her official capacity as the Executive Director of the Illinois State Board of Elections, | ) ) ) ) | Magistrate Judge Jeannice Appenteng |
| | ) | |
| Defendants. | ) | |
| INDEPENDENCE PARTY, GARY PIERCE, and ALEJANDRO CABRERA, | ) ) | |
| | ) | |
| Intervenor-Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| ILLINOIS STATE BOARD OF ELECTIONS, and, BERNADETTE MATTHEWS, in her official capacity as the Executive Director of the Illinois State Board of Elections, | ) ) ) ) ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

**Motion to Intervene as Plaintiffs**
**by Gary Pierce, Alejandro Cabrera, and the Independence Party**
**and for Expedited Consideration**

GARY PIERCE, ALEJANDRO CABRERA and the INDEPENDENCE PARTY

(collectively, "Proposed Intervenors") seek to participate in the above-captioned lawsuit

as plaintiffs who challenge the constitutionality of Illinois' ballot access requirements as

applied to them and as enforced by Defendant Illinois State Board of Elections in

relation to the November 3, 2026 general election.

As set forth in the accompanying memorandum of law, Proposed Intervenors are entitled to intervene as a matter of right pursuant to Fed. R. Civ. P. 24(a). In the alternative, Proposed Intervenors request permissive intervention pursuant to Fed. R. Civ. P. 24(b). Proposed Intervenors have conferred, through counsel, with the original Plaintiffs, and Plaintiffs do not object to the requested relief.

Proposed Intervenors also respectfully request expedited consideration of this motion with expedited briefing because their proposed complaint pertains to the November 3, 2026 general election. Ballot access petition gathering efforts currently under way, with anticipated filing during the statutorily defined filing period of May 18-26, 2026. Thereafter the Defendants will convene as the State Officers Electoral Board in June 2026 (date not yet scheduled), and entertain objection petitions seeking to strike candidate ballot access petitions, which may include requests to strike entire sheets of otherwise registered voters through the "dual circulator" restriction in 10 ILCS 5/10-4. A decision upon this motion, and corresponding requested injunctive relief, is respectfully requested prior to petition filing, if possible, or prior to the commencement of electoral board proceedings commencing at or around the second week of June 2026.

In accordance with Rule 24(c), the Proposed Intervenors' (proposed) Verified Complaint is attached hereto as **Exhibit A**.

In addition, Proposed Intervenors submit their proposed motion for preliminary injunction attached as **Exhibit B**, and their memorandum of law attached as **Exhibit C**.

WHEREFORE, Proposed Intervenors respectfully request that this honorable Court grant their request for expedited consideration and briefing of this motion, and

grant Proposed Intervenors leave to intervene in the above-captioned matter and to file their Complaint, Motion for Preliminary Injunction, and Memorandum in Support of Motion for Preliminary Injunction.

Respectfully submitted:

| | |
|---|---|
| /s/  Christopher D. Kruger | /s/  Andrew Finko              . |
| Christopher D. Kruger | Andrew Finko |
| Law Office of Christopher Kruger | 875 N. Michigan Ave. |
| 2022 Dodge Avenue | Suite 3100 |
| Evanston, IL 60201 | Chicago, IL 60611 |
| 847.420.1763 | (773) 480-0616 |
| chris@kruger-law.com | Finkolaw@Fastmail.FM |

**Certificate of Service**

I, the undersigned an attorney, certify that on April 4, 2026 I electronically filed the foregoing filing with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, which sends an email with a download link of this filing to all counsel of record.

/s/  Andrew Finko              .

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TEAM KENNEDY, LIBERTARIAN PARTY )
OF ILLINOIS, ROBERT F. KENNEDY JR., )
WILLIAM REDPATH, and ANGEL OAKLEY )
                                       )      No. 24-cv-7027
     Plaintiffs,             )
vs.                            )
                                         )      Hon. John Kness
ILLINOIS STATE BOARD OF ELECTIONS,)
and, BERNADETTE MATTHEWS, in her   )      Mag. Judge Jeannice Appenteng
official capacity as the Executive Director of )
the Illinois State Board of Elections,     )
                                       )
     Defendants.            )
_____)
INDEPENDENCE PARTY, GARY PIERCE, )
andALEJANDRO CABRERA,        )
                                       )
     Intervenor-Plaintiffs,     )
vs.                            )
                                       )
ILLINOIS STATE BOARD OF ELECTIONS,)
and, BERNADETTE MATTHEWS, in her   )
official capacity as the Executive Director of )
the Illinois State Board of Elections,     )
                                       )
     Intervenor-Defendants.    )

**[PROPOSED] VERIFIED INTERVENORS' COMPLAINT**

Intervenor-Plaintiffs, Independence Party, Gary Pierce, and Alejandro

Cabrera, through their attorneys, file their [Proposed] Verified Intervenors'

Complaint against the Illinois State Board of Elections and its Executive Director,

Bernadette Matthews ("Intervenor Defendants") and state as follows.

**Nature of the Case**

1.     This is an action to declare unconstitutional and to enjoin a provision

within Section 10-4 of the Illinois Election Code, 10 ILCS 5/10-4, prohibiting

persons who circulated candidate petitions for nomination in an established

1

political party primary, from subsequently circulating candidate petitions for an independent or a new political party candidate. This provision is referred to herein as the "dual circulator" restriction. Intervenor-Plaintiffs assert that the Illinois Election Code contains considerably more burdensome requirements for independent and new party candidates than legitimately necessary to prevent voter confusion, deter frivolous candidates, and/or maintain the orderly administration of elections, as confirmed by the history that show only a handful of independent and new political party candidates have been able to gain ballot access over the past half a century.

2.      Intervenors seek a declaratory order finding that the "dual circulator" restriction in 10 ILCS 5/10-4 is unconstitutional on its face, and as applied, to Intervenors and all candidates affected by this provision, because this restriction is an unconstitutional infringements upon the First Amendment rights of Intervenors and their supporters who desire to exercise their First Amendment right to circulate petitions for new political party candidates, and is otherwise in violation of the First and Fourteenth Amendments to the United States and Illinois Constitutions.

3.      Intervenor-Plaintiffs assert similar arguments as those raised by Plaintiffs, Team Kennedy, Libertarian Party of Illinois, Robert F. Kennedy Jr., William Redpath, and Angel Oakley, as the Intervenor-Plaintiffs are now restricted in their petition gathering and ballot access rights by the "dual circulator" restriction of 10 ILCS 5/10-4. Intervenor-Plaintiffs hereby adopt and incorporate by reference each paragraph of Plaintiffs' Amended Complaint (Dkt. #31).

2

<u>Jurisdiction</u>

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 and 2201, because the matters in controversy arise under the US and Illinois Constitutions, as they concern the deprivation, under color of state law, of rights secured to Intervenors under the US and Illinois Constitutions, and because they are proper subjects for declaratory judgment.

5.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because one or more of the Defendants maintains a permanent residence and/or office in this district in Illinois, and because the Defendants simultaneously conduct each of their meetings in this district, undertake significant election administration duties in this district, and regularly hold proceedings in its Chicago office that enforce the Election Code and result in the removal of candidate names from the ballot.

6.    Intervenor-Plaintiffs exercise their right to petition to intervene pursuant to Fed R.Civ.P. 24 to assert their First Amendment ballot access rights and to protect their interests in those rights, that would otherwise be adversely affected by the application of the "dual circulator" restriction in 10 ILCS 5/10-4 by the Defendants. *See* Intervenors' Motion to Intervene and Memorandum in support.

<u>Parties</u>

7.    Intervenor-Plaintiff, Independence Party, is a new political organization formed in 2025 that aspires to attain the status of becoming an "established political party" within the meaning of Articles 7 and 10 of the Illinois Election Code. The Independence Party is comprised of Illinois residents and voters who desire to see their candidates' names upon the general election ballot

3

and to attain established political party status in Illinois at the November 3, 2026 general election.

8.      Intervenor-Plaintiff, Gary Pierce ("Pierce"), is a resident of Springfield, Illinois, a longtime registered voter in the State of Illinois, and currently seeking ballot placement and election for the Illinois Constitutional elected office of Governor as a candidate of the Independence Party. Pierce is not affiliated with the Democratic Party or the Republican Party, and does not identify as a member of either the Democratic or the Republican party.

9.      Intervenor-Plaintiff, Alejandro Cabrera ("Cabrera"), is a resident of Aurora, Illinois, a longtime registered voter in the State of Illinois, and currently seeking ballot placement and election for the Illinois Constitutional elected office of Lieutenant Governor as a candidate of the Independence Party.  Cabrera is not affiliated with the Democratic Party or the Republican Party, and does not identify as a member of either the Democratic or the Republican party.

10.      Intervenor-Defendant, Illinois State Board of Elections ("ISBE"), is an Illinois agency created by the General Assembly in 1973 to supervise the administration of elections throughout the State, with statutory authority defined in the Election Code, 10 ILCS 5/1A-1, et seq. The ISBE is compromised of four members self-affiliate with the Democratic Party and four members who self-affiliate with the Republican Party, all of whom are selected and appointed by the State Governor pursuant to 10 ILCS 5/1A-3. Since its creation, the ISBE has been granted greater authority by the General Assembly, including the power to maintain a database of registered voter with voter addresses and signatures, and coordinating and overseeing election administration throughout the State.

Incidental to its statutory authority, the ISBE regularly gathers information and offers recommendations to promulgate new laws and procedures to the General Assembly and the Election Laws Commission. ISBE members also serve as members of the State Officers Electoral Board ("SOEB"), a quasi-judicial governmental entity that is constituted and convenes after an objection petition is filed seeking to disqualify a candidate's ballot access petitions. The SOEB has the authority of determining the sufficiency and validity of a candidate's voter signatures as compared to the ISBE's voter database, holding evidentiary hearings, and removing a candidate's name from the ballot.

11. Intervenor-Defendant, Bernadette Matthews, is the Executive Director of the ISBE and is sued in her official capacity as the chief state election official that implements, enforces, and recommends amendments to the Election Code in Illinois, as well as general supervision over the operation of the business of the Board and its equipment, facilities, employees and consultants in accordance with the rules and regulations of the Board and as otherwise directed by the Board. In addition, Intervenor-Defendant, Bernadette Matthews prepares, signs, and disseminates ISBE's meeting notices, ISBE meeting minutes, and other public notices on behalf of the ISBE in her capacity as Executive Director.

### Enhanced Ballot Access Requirements for Independent and New Political Party Candidates

12. The Illinois Election Code 10 ILCS 5/10-1, et seq. governs independent and new party candidates that seek election by Illinois voters at Illinois general elections held in November.

13.     The Illinois Election Code, at 10 ILCS 5/2A-1.2(a), confirms that Illinois has only one election in November for Constitutional, Presidential, and certain statutory office elections.

14.     The Election Code at 10 ILCS 5/9-1.9 divides each election cycle into two defined time periods, the first of which ends the day of each political party's primary, and the second part of the election cycle commences on the day after the primary election through December 31st following the general election in November.

15.     The Election Code at 10 ILCS 5/2A-1.2(b) allows established political parties to nominate their candidates for the general election at a primary.  A primary is a publicly-funded private party candidate nomination process, effectively reaching the same result as a caucus, see 10 ILCS 5/2A-1.2(b), and is not an election of any governmental office holders. One candidate for each elected office is selected by each established political party at their respective primary elections, and such candidates are then automatically added to the general election ballot, alongside independent and new political party candidates, for election to governmental office by Illinois voters in November.

16.     Established political parties in Illinois, including the Democratic and Republican parties, are private, non-governmental entities that support and promote their candidates for elected office; the Democratic and Republican parties have been the only two established Statewide political parties that have been able to maintain Statewide established party status in Illinois for more than four years.

17.     The Election Code 10 ILCS 5/10-2 allows a new political party to become an established political party only after its candidate for Governor attains

6

ballot placement and then receives over 5% of the vote; thereafter, nomination papers for candidates of an established political party are governed by far less burdensome requirements defined in Article 7 and/or Article 8 of the Election Code, entitling the established party the option of nominating its candidates through a primary or through a caucus, along with dramatically lower signature requirements. 10 ILCS 5/7-1, et seq., 10 ILCS 5/8-1, et seq.

18. Independent candidates, however, gain no benefit of reduced ballot access requirements in subsequent elections by either winning an election or attaining more than 5% of the vote, and are still required to meet the same heightened ballot access requirements defined in Article 10 of the Election Code at each subsequent election.

19. For the November 3, 2026 general election, established party candidates first gather signatures during a 90 day period that started August 5, 2025 and ended November 3, 2025, in order to be able to compete in their respective party's primary on March 17, 2026. During this 90-day time, established party candidates for Governor, statewide office, and U.S. Senator were required to submit 5,000 signatures, often on a slate petition with all candidate names upon the same petition, while other candidates for non statewide offices seeking established party nominations submitted lower numbers of signatures for nomination through their primaries, such as 500 signatures for Illinois State Representative, 1,000 for Illinois Senator; generally the signature requirement is not less than 0.5% (.005) of the qualified primary electors of their party in their district (10 ILCS 5/7-10).

20. Independent and new political party candidates gain ballot access through the procedures set forth in Article 10 of the Illinois Election Code, 10 ILCS

5/10-1, et seq.; pursuant to Article 10, independent candidates are required to submit signatures equaling at least 5% but not more than 8% of the number of ballots cast at the last general election, and new party candidates are required to submit signatures equaling at least 5% of the ballots cast at the last general election, or 25,000 whichever is less.

21.    For the November 3, 2026 general election, statewide independent and new political party candidates, such as the Intervenors, must gather a sufficient number of signatures during a 90-day period starting on February 25, 2026 and ending on May 26, 2026.

22.    To qualify for the Illinois statewide general election ballot, the Election Code at 10 ILCS 5/10-2, 10-3 requires an independent or new political party candidate, including candidates for Governor or Statewide office to submit a minimum of 25,000 signatures from registered voters of the State, all gathered within a 90-day period, with each sheet being sworn to before a notary public, and thereafter successfully overcoming the "objection process" defined in 10 ILCS 5/10-8, 10-9, 10-10, which starts after an objector's petition is filed during the statutorily defined filing period between May 26, 2026 and June 2, 2026.

23.    Realistically and as a practical matter, statewide independent and new political party candidates must gather and submit at least 50,000 signatures to overcome the strenuous ballot access requirements of Article 10 of the Election Code. This is further exacerbated by the State of Illinois' reliance upon an archaic ink and paper on clipboard signature gathering process that is fraught with handwriting legibility issues, in addition to potential errors in a voter's registration address being out of date (or canceled), or the signature written upon a clipboard in

8

haste not matching a digitized image or "clip" of the voter's signature from when the registration card was signed, particularly since penmanship and cursive handwriting have not been taught in grammar schools for decades.

24. The need for gathering and submitting double the stated minimum number of signatures results from Illinois' electoral board "objection process" whereby any one voter, usually acting on behalf of an established political party, allows the use of his/her name for an objection to the ballot access petitions and signatures submitted by independent and new political party candidates for the purpose of obtaining a decision from Defendant to remove a candidate from the ballot and thus deny all voters that signed the petition their right to see the candidate of their choice appear on the general election ballot.

25. Importantly, the Election Code does not authorize nor require the Defendants, or any election authority, to check voter signatures or review candidate nomination papers for compliance with the Election Code, absent an objection filed by such a private actor; there is no "apparent conformity" checking and disqualification authority within the Election Code extended to Defendants, nor to any election authority.

26. Defendant ISBE has previously certified candidate names to the ballot with zero signatures, and certified candidates with signatures upon one or two sheets, and in such situations, there was no voter confusion, no ballot overcrowding, nor concerns raised by the Defendant about frivolous candidate names appearing on the ballot; indeed, where an objection is filed and withdrawn, or where no objection is filed, Defendant and various election authorities

9

throughout the State have placed candidate names upon the ballot, regardless of a candidate's compliance with the Election Code.

27. For historical reference, in 1982, the Election Code, at 10 ILCS 5/10-3, stated that "[e]very petition for nomination of an independent candidate for any office for which candidates of established political parties are nominated at the general primary shall be filed within the time designated in Section 7-12 of this Act in regard to nomination at the general primary of any other candidate for such office" meaning that established party candidates and independent candidates were gathering signatures for the same statutorily scheduled filing deadline.

28. However, in 1982, the Election Code did not restrict the duration of time that a candidate could gather signatures *prior* to the designated filing date for nomination papers in advance of the primary nomination date, nor restrict the duration of time that independent and new political party candidates could gather signatures in advance of the filing date for candidate petitions for placement of independent and new party candidates directly on the November general election ballot.

29. Subsequently, in 1983 the Illinois legislature enacted Public Act 83-1055, adding a restriction on signature collection duration for all candidates to a 90-day duration of time prior to the petition filing dates, and the legislative debate shows this was enacted primarily to restrict ballot access for non-incumbent candidates; thus, before P.A. 83-1055 (SB 1218) went into effect on February 1, 1984 there was no durational restriction on when independent and new political party candidates could start circulating signature petitions, nor was there a restriction on the duration of time for any candidate to gather ballot access petition signatures.

30.     Through the operation of 10 ILCS 5/10-3 from 1982 until 2007, independent candidates gathered petition signatures for the same filing date that established party Democratic and Republican candidates gathered their signatures; established party candidates gathered signatures to appear on their respective primary nomination ballots; independent candidates did not appear on a primary ballot or participate in a primary, and were directly eligible for ballot placement upon the November general election ballot.

31.     Through P.A. 095-0699, effective November 9, 2007, the provisions of 10 ILCS 4/10-3 "Every petition for nomination of an independent candidate for any office for which candidates of established political parties are nominated at the general primary shall be filed within the time designated in Section 7-12 of this Act in regard to nomination at the general primary of any other candidate for such office" was **stricken** and removed from the Election Code; thereafter, independent candidates gathered signatures alongside new party candidates during the second part of the election cycle with a ballot access petition filing date that was six or so months after established party candidates filed their nomination papers.

32.     Also, in 1982, the Election Code, at 10 ILCS 5/10-4, required circulators of candidate petitions to be Illinois registered voters and also to be residents of the political division in which the candidate sought nomination.

33.     Subsequently, through P.A. 92-0129 effective July 20, 2001, the provisions in 10 ILCS 5/10-4 that defined circulator eligibility to include being an Illinois registered voters in the same district in which a candidate sought elected office were stricken, and thereafter, the only eligibility requirements defined in 10

11

ILCS 5/10-4 to be a circulator included being at least 18 years of age at the time of the primary or general election, and a US citizen.

34. In 1982 there was no prohibition on a candidate who withdrew from, or lost an established party nomination at a primary from seeking election as an independent or a new political party candidate at the November general election, as was the fact scenario in *John W. Moore v. Bd. of Elec. Com'rs*, 794 F. 2d 1254 (1986) and 845 F.2d 144 (1988).

35. Subsequently, in 1983, the Election Code 10 ILCS 5/10-2 was amended to add the following "sore loser" restriction: "[a] candidate for whom a nomination paper has been filed as a partisan candidate at a primary election, and who is defeated for his or her nomination at the primary election, is ineligible for nomination as a candidate of a new political party for election in that general election."

36. Through P.A. 097-0681 effective March 30, 2012, the Election Code 10 ILCS 5/7-43 added yet another "sore loser" provision, to bar candidates who sought nomination of a political party and withdrew their nomination papers, or participated in a primary nomination, as follows:

> A person (i) who filed a statement of candidacy for a partisan office as a qualified primary voter of an established political party or (ii) who voted the ballot of an established political party at a general primary election may not file a statement of candidacy as a candidate of a different established political party or as an independent candidate for a partisan office to be filled at the general election immediately following the general primary for which the person filed the statement or voted the ballot. A person may file a statement of candidacy for a partisan office as a qualified primary voter of an established political party regardless of any prior filing of candidacy for a partisan office or voting the ballot of an established political party at any prior election.

37.     At all relevant times the Election Code, 10 ILCS 5/7-1, 10 ILCS 5/8-8, has protected established political party nominations at their primary by restricting Illinois voters who signed petitions from signing for a different political party as follows: "A '**qualified primary elector**' of a party may not sign petitions for or be a candidate in the primary of more than one party." Application of this provision is through the objection process, and if proven up by an objector, an electoral board could strike that later-signed voter's signature from a candidate's petition sheet.

38.     In addition to a significantly higher number of signatures that independent and new political party candidates had to gather and submit as compared to Democratic and Republican party candidates, the Election Code 10 ILCS 5/10-4 requires this much larger number of signature petition sheets to each contain the notarial *jurat* of a notary public, rather than the well-accepted declaration under penalties of perjury as authorized by the Illinois Code of Civil Procedure, 735 ILCS 5/1-109 and similarly by 28 U.S. Code § 1746, and as accepted in all court proceedings, and as used by many other state election authorities for ballot access petitions.

39.     For the 2026 general election, the Election Code, at 10 ILCS 5/7-10, 10 ILCS 5/8-8, and 10 ILCS 5/10-4 continues to impose the same 90-day duration of time governing the established party candidates' much lower signature requirements, to independent and new political party candidates who have to gather a much larger number of signatures.

40.     The "dual circulator" restriction in 10 ILCS 5/10-4 further restricts independent and new political party candidates' ability to attain ballot placement by "locking in" circulators to an established political party membership or

13

affiliation (that is not otherwise allowed in any other section of the Election Code) based upon the person having circulated for any established party candidate for nomination at the party's primary during the first portion of the election cycle, 10 ILCS 5/9-1.9(1) and (2); this party identity "lock in" then operates to restrict those same persons who circulated for a Democratic or Republican candidate nomination, from later circulating petitions in the second part of the election cycle for an independent or new political party candidates' ballot placement for election.

41. Illinois is the only state in the Nation which prohibits petition circulators, including volunteer and professional petition circulators, based solely upon the prior Election-Code imposed identity as a Democrat or Republican, from circulating for independent or new political party candidates for the same general election (referred to as the "dual circulator" provision).

42. The "dual circulator" restriction is in Article 10 of the Election Code at 10 ILCS 5/10-4 and this provision "locks in" circulator identities as either being Democrats or Republicans, and only benefits established political parties to prohibits such circulators from subsequently exercising First Amendment rights and delivering the message of independent and new political party candidates, in part as follows:

> Provided, further, that no person shall circulate or certify petitions for candidates of more than one political party, or for an independent candidate or candidates in addition to one political party, to be voted upon at the next primary or general election, or for such candidates and parties with respect to the same political subdivision at the next consolidated election.

43. The "dual circulator" provision in 10 ILCS 5/10-4 is applied when a voter files an objector's petition and seeks to strike every signature upon a sheet circulated by a person that, during the primary nomination period, was identified

14

as either a Democrat or Republican because that person circulated even a single petition sheet for a candidate seeking nomination at a primary of an established party primary.

44. The Illinois Election Code by virtue of it being an Illinois ballot access scheme, should apply only within the boundaries of the State of Illinois, and had no stated "long-arm" or extra-territorial jurisdiction to impose political party affiliation or membership provisions upon non-voters who reside outside of the State and would be governed by another state's ballot access laws.

45. There is no provision in the Election Code that lets an Illinois voter sign up or register to become a "member" or affiliate of an established party.

46. The Election Code does not define a political party registration or membership process; and the only method for a resident of Illinois to identify or affiliate with an established party under the Election Code is for such person to register to vote and then take one or more of the following actions: (a) file a statement of candidacy as a candidate for nomination at an established party's primary, (b) by signing a partisan candidate's petition, or (c) requesting a partisan ballot and participating in a political party's primary nomination.

47. Because the circulation time for established political party candidate nomination papers occurs six or so months prior to the start of independent and new political party candidate circulation, established political party candidates have the the first choice in each election cycle to enlist persons to circulate for their candidate nominations, with no restriction on prior circulators applicable to partisan circulators.

48. An established political party's primary in March (or in prior elections, in February) is not an election of any government officials, rather it is a process for a "qualified primary elector" (10 ILCS 5/3-1.2) of an established political party to nominate that voter's preferred candidate for each office to be voted upon at the general election in November.

49. An established political party's primary is a publicly-funded non-governmental private entity's process for selecting its own candidates for the election of government officials that occurs in November, and a primary reaches the same result as a party caucus; a primary is not an "election" for any elected government offices.

50. The Election Code imposes First Amendment restrictions and impediments upon independent and new political party candidates, that bars person from circulating for an independent or new party candidate based solely upon the identity of a petition circulator being a "member" or affiliate of an established political party because that person circulated nomination petitions for the primary, which is a non-governmental entity's private candidate selection process for the general election.

51. Neither Defendants, nor any election authority in the State, maintain a process, registry, or membership for any person to become an affiliate or registered member of an established political party in Illinois; the Election Code does not define a process for a person who is a non-voter of this State, or any other state, to affiliate or register to become a member of an Illinois established political party.

52. Similarly, neither the Defendants, nor any election authority in the State, maintain a list, database or other source of the names of persons who have

16

circulated nomination petitions for established political party candidates seeking a political party's nomination at a primary, either within Illinois or outside the State.

53.     Independent and new political party candidates thus have no process, means, or notice available to them to check and/or verify if a person has previously circulated petitions for an established political party in relation to a candidate's nomination at a primary, or avoid the draconian impact of the "dual circulator" restriction in 10 ILCS 5/10-4.

54.     Established political parties however have access to voter databases (ie NGP VAN) which their own candidates populate with information, including the names of all persons who circulated petitions for one of their candidates seeking the party's nomination at a primary.

55.     Application of the dual-circulator provision in 10 ILCS 5/10-4 is extremely burdensome to independent and new political party candidates seeking ballot access at the November 3, 2026 general election because this provision dramatically restricts the number of experienced circulators, and virtually excludes all paid petition gathering companies *de facto*, since they have already previously gathered petitions for nomination in 2025 for candidates competing for their own party's nomination at the March 17, 2026 primary.

56.     Prohibiting independent and new political party candidates from contracting for the services of petition circulators who circulated for Republican, Democratic, or other political party candidates advances no legitimate state interest or regulatory purpose and is unconstitutional under an application of the Supreme Court's balancing test to determine the constitutionality of a ballot access restriction as articulated in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), particularly in

17

light of the Supreme Court's holdings in *Meyer v. Grant*, 486 U.S. 414 (1988)*, Citizens United v. Fed. Elec. Com'n*, 558 U.S. 310 (2010), and *Chiles v. Salazar*, 607 U.S. \_\_\_ (2026).

57.     The "dual circulator" provision in 10 ILCS 5/10-4 is not necessary for the administration of elections in Illinois by any election authority in the State, and has absolutely no impact or effect on the administration of election in Illinois, but instead forces Intervenor-Plaintiffs to incur damages through additional financial costs to pay circulators, some from out of state, to gather far more signatures than they would have had to gather if the "dual circulator" provision was not contained in the Election Code, and Intervenor-Plaintiffs have incurred actual pocketbook damages.

58.     Enforcement of the "dual circulator" provision in 10 ILCS 5/10-4 to bar petition circulators who circulated ballot access petitions for Republican, Democratic, or other party candidates in Illinois or in other states, from circulating petitions for independent and new political party candidates in Illinois is a severe burden on rights guaranteed to Intervenors under the First and Fourteenth Amendments to the United States Constitution which is not narrowly tailored to advance any, let alone a compelling governmental or regulatory interest.

59.     The application of the "dual circulator" provision in 10 ILCS 5/10-4 to independent and new political party candidates is a *de facto* ban upon independent and new party candidates hiring and relying upon paid circulators, in violation of the holding in *Meyer v. Grant,* 486 U.S. 414 (1988), an impermissible restriction upon trade and commerce in Illinois, and an impermissible restriction upon the right of Illinois residents to seek compensation as paid circulators for independent and new

18

political party candidates, with no legitimate state interest or regulatory purpose necessary for the administration of elections in Illinois.

60.     Circulation of ballot access petitions necessarily constitutes "core political speech" for which First Amendment protection is at its zenith. *Meyer v. Grant*, 486 U.S. 414 (1988).

61.     Application of the "dual circulator" provision in 10 ILCS 5/10-4 is also a "content-based" restriction that impermissibly restricts petition circulators from exercising their right under the First and Fourteenth Amendments to engage in circulation which is "core political speech" to support and see the names of the candidates of their choice appear upon the general election ballot.

62.     While Illinois law permits voters the right to split their support among different political party candidates during an election year, and does not prohibit voters from signing petitions for partisan and independent or new political party candidates, it denies petition circulators that same right to split or switch support to different candidates, even though circulators do not need to be registered voters.

63.     Persons who are not registered to vote in Illinois, and are not residents of the State of Illinois, and thus are not eligible to be "qualified primary electors" of an established political party have been nevertheless ensnared by the "dual circulator" provision of 10 ILCS 5/10-4, and have been identified as Democrats or Republicans by Defendants, who thereafter barred them from engaging in otherwise protected "core political speech" protected by the First Amendment.

64.     The application of the "dual circulator" provision of 10 ILCS 5/10-4 by Defendants sitting in their capacity as the State Officers Electoral Board, and by other electoral boards in the State, has in the past, and likely in the future, the very

19

real effect of unconstitutionally and without any notice and due process to candidates and their voters who sign their petitions, denying otherwise registered and duly qualified voters in Illinois their First and Fourteenth Amendment rights to sign independent and new political party candidate petitions.

65.     In 1986 and 1988, the 7th Circuit upheld the "dual-circulator" provision in *John W. Moore v. Bd. of Elec. Com'rs*, 794 F. 2d 1254 (1986) and 845 F.2d 144 (1988) as applied to the candidacy of John W. Moore as a new political party candidate at the November 1982 general election.

66.     Since the events at issue in *John Moore I & II,* the Election Code has had major amendments, that revised the Election Code to impose additional obstacles to independent and new party candidates, and added numerous provisions to protect established parties and their candidates.

67.     The Court of Appeals for the Seventh Circuit reviewed the candidacy of John W. Moore: a candidate who withdrew from the Democratic Party primary in March 1982, and ran as a new party candidate for the November general election.  The facts presented in *Moore I & II* – that of a candidate withdrawing after qualifying for nomination at a party primary, and then circulating petitions as new political party candidate – is incapable of repetition under the present-day Election Code; and, the reasoning underlying the support of the "dual circulator" restriction has been obviated in light of the other established party protections that have enacted since those decisions.

68.     In addition, the Supreme Court decisions in *Meyer v. Grant,* 486 U.S. 414 (1988), *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999), *Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010), *Chiles v. Salazar,* 607 U.S.

20

__ (2026) also render the decisions in *Moore I & II* inapplicable to independent and new party candidates as governed by the Election Code in 2026.

69.     A January 12, 2026 Gallup poll[1] found that the number of persons who affiliate as Democratic or Republican has dropped, while the number of persons who are independent has increased – a "record-high" 45% of U.S. adults identified as political independents in 2025, surpassing the 43% measured in 2014, 2023 and 2024. Meanwhile, equal shares of U.S. adults — 27% each — identified as either Democrats or Republicans."

70.     History confirms the oppressiveness of Illinois' Election Code for independent and new political party candidates because there have been no independent or new political party candidates elected to Constitutional or statewide office in Illinois, and very few that have been able to overcome the ballot access requirements of Article 10 of the Election Code, not because there are no independents in Illinois, but due to the oppressive and overly burdensome Election Code – an Election Code that was written and regularly amended not by independent Legislators, but by partisan officials that have controlled the Legislature – for the purpose of protecting their party, and making it more difficult for independent and new political party candidates to attain ballot placement.

**CAUSES OF ACTION**
**COUNT I**
**As-Applied First & Fourteenth Amendments to the United States Constitution**
**(Circulator who reside outside of Illinois)**

1-70.   Intervenors reassert Paragraphs 1-70 as if fully stated herein.

71.     Application of "dual circulator" restriction in 10 ILCS 5/10-4 to strike otherwise valid voter signatures from independent and new political party

---

[1]   https://news.gallup.com/poll/700499/new-high-identify-political-independents.aspx

candidate petitions, solely because those signature were collected by circulators who are identified by the Election Code as Democrats or Republicans, or other political parties <u>outside</u> the state of Illinois deprives Intervenors, and all independent and new political party candidates, access to experienced and paid out of state petition circulators.

72. The denial of the right of independent and new political party candidates to contract for the services of the paid and experienced petition circulators just because they previously circulated ballot access petitions for a Republican, Democratic, and/or other political party primary candidate <u>outside</u> the state of Illinois imposes a severe burden on rights guaranteed to Intervenors under the First and Fourteenth Amendments to the US Constitution.

73. Application of 10 ILCS 5/10-4 to ban circulators from circulating for Illinois independent and new political party candidates when the circulator previously circulated for a Republican, Democratic, or other political party candidates seeking nomination or election in states outside of Illinois, fails to narrowly advance any legitimate state interest or regulatory purpose.

74. Accordingly, application of the "dual circulator" provision in 10 ILCS 5/10-4 to restrict circulators from circulating for Illinois independent and new political party candidates when the circulator previously circulated for a Republican, Democratic, or other political party candidate <u>outside</u> the state of Illinois impairs rights guaranteed to Intervenors under the First and Fourteenth Amendments to the US Constitution for which Intervenors seek relief.

22

**COUNT II**
**As-Applied violation of First & Fourteenth Amendments**
**to the United States Constitution**
**(Circulators who reside within Illinois)**

1-70.   Intervenors reassert Paragraphs 1-70 as if fully stated herein.

71.   Application of 10 ILCS 5/10-4 to ban circulators from circulating for Illinois independent and new political party candidates, solely because those signature were collected by circulators who are identified by the Election Code as Democrats, Republicans, or other political party candidates seeking nomination at an Illinois primary deprives Intervenors, and all independent and new political party candidates access to the experienced and paid petition circulators from circulating ballot access petitions in the state of Illinois.

72.   The denial of the right of independent and new political party candidates to contract for the services of the experienced and paid petition circulators just because they previously circulated ballot access petitions for a Republican, Democratic, and/or other political party primary candidate seeking nomination at an Illinois primary imposes a severe burden on rights guaranteed to Intervenors under the First and Fourteenth Amendments to the United States Constitution.

73.   Application of 10 ILCS 5/10-4 to ban circulators from circulating for Illinois independent and new political party candidates when the circulator prior circulated for a Republican, Democratic, or other political party candidate seeking nomination at an Illinois primary fails to narrowly advance any legitimate state interest or regulatory purpose.

74.   Accordingly, application of the "dual circulator" provision in 10 ILCS 5/10-4 to ban circulators from circulating for Illinois independent and new political

23

party candidates when the circulator prior circulated for a Republican, Democratic, or other political party candidate seeking nomination at an Illinois primary impairs rights guaranteed to Intervenors under the First and Fourteenth Amendments to the United States Constitution for which Intervenors seek their requested relief.

**COUNT III**
**Facially unconstitutional violation of**
**First & Fourteenth Amendments to the United States Constitution**

1-70.   Intervenors reassert Paragraphs 1-70 as if fully stated herein.

71-74.   Intervenors reassert Paragraphs 71-74 of Count I above, as if fully stated herein.

75-79.  Intervenors reassert Paragraphs 71-74 of Count II above, as if fully stated herein.

80.     Illinois is the only state in the Nation to include a "dual circulator" restriction as stated in 10 ILCS 5/10-4, based solely upon the identity of the circulator as affiliated to the party of the candidate for whom s/he circulated, and then restricts that person from later circulation, thus imposing a *de facto* political party affiliation or membership to those persons who are circulators for political party nominations, including people residing out of state, and those who are not registered voters, and thus are not "qualified primary electors" capable of signing partisan nomination petitions or participating in a party primary in Illinois.

81.     In addition to violating the First Amendment, this "dual circulator" restriction constitutes an impermissible restraint on trade, commerce, and the ability of persons to gain compensation for circulation that they are otherwise qualified and experienced to perform.

24

82. The "dual circulator" provision of 10 ILCS 5/10-4 creates an otherwise impermissible established political party identity or membership and "lock-in restriction" that is inconsistent with other provisions of the Election Code defining requirements for being a circulator as a US Citizen over 18 years of age, 10 ILCS 5/10-4, and imposing a quasi-voter, "qualified primary elector" status to non-voters.

83. The "dual circulator" provision of 10 ILCS 5/10-4 thus creates an artificial political party identity and "lock-in" provision, not otherwise provided for in the Election Code, for in-state and for out-of-state circulators, for which there otherwise is no statutory authority in the Election Code, given that such persons who are not registered to vote or are nonresidents, would not be eligible to sign a partisan candidate's nomination petition or participate in an established party primary nomination of candidates.

84. In combination with other restrictions that have been added to the Election Code since the *John W. Moore* cases were decided as well as the five to ten times greater signature requirement, the 90 days petitioning limit, with each sheet requiring a notarization, and the need to overcome the objection process, the "dual circulator" provision is neither necessary to ensure a modicum of support nor to protect any legitimate State interests for the administration of elections.

85. The "dual circulator" provision of 10 ILCS 5/10-4 is ripe for abuse and opportunistic use by established political parties, **who have in the past**, and could in the future, dispatch their operatives who previously circulated for an established party candidate as saboteurs to gather petitions for an independent or new political party candidate, and create reliance upon those signatures that will then draw an objection, but without ability to avoid the such entrapment. The objection process

25

is a serious obstacle which drains financial and time resources before an electoral board, and generates an "objection pending" designation that creates a reputational stigma that effectively stops all fundraising, and stays organizational endorsements and forum opportunities.

86.     The "dual circulator" provision of 10 ILCS 5/10-4 serves no legitimate need or purpose of the Defendants, nor any election authority, since it has no relationship to the administration of elections.

87.     On its face, the "dual circulator" provision of 10 ILCS 5/10-4 unconstitutionally restricts and denies Intervenors' and all of their petition signers' First and Fourteenth Amendment rights to associate in support of the candidate of their choice and see the candidates of their choice appear on the general election ballot.

**COUNT IV**
**Violation of Equal Protection Clause**
**of the Fourteenth Amendment to the United States Constitution**

1-87.     Intervenors reassert Paragraphs 1-87 as if fully stated herein.

88.     Established political party candidates circulate petitions and gather signatures not for <u>election to office</u>, but rather to be <u>eligible for nomination</u> by their respective parties at their primary, which is the legal equivalent of a caucus, and a private selection process undertaken by "qualified primary electors."

89.     One prevailing candidate for each office selected through an established political party primary is then automatically added to the November general election ballot, and such candidates also participate in the second cycle of the election, which includes a reset of donation limits, and a second round of candidate forums and endorsements.

90. Established political parties that circulate petitions for nomination at their respective primaries do not have restrictions upon prior circulators based upon the "dual circulator" provision of 10 ILCS 5/10-4, since they are first to circulate, and are thus able to hire experienced and paid circulators at or before the start of the established party petition dates which are during the Fall over one year prior to the general election.

91. Independent and new political party candidates are unable to hire experienced and paid petition circulators, and unable to enlist the help of politically active volunteers, as most of whom have, without knowledge of the "dual circulator" restriction and its penalty of rendering signatures invalid, have already circulated for the earlier-in-time established political party candidate nominations.

92. Because Republican and Democratic candidates seeking their party's nomination at their primaries are able to circulate their petitions prior to independent and new political party candidates, established party candidates regularly hire most or all professional petition circulators, reducing the pool of potential and available circulators, thus denying independent and new political party candidates access to the experienced and paid army of petition circulators as a direct and proximate result of the "dual circulator" restriction contained in 10 ILCS 5/10-4.

93. Allowing established party candidates the unrestricted freedom to choose any petition circulators for their own nomination petitions, free from the "dual circulator" restriction and wholesale striking of entire sheets of signatures by operation of the "dual circulator" provision in 10 ILCS 5/10-4, and then permitting objections to be lodged against independent and new party candidates based upon

27

those same circulators' Election-Code imposed identities as Democrats or Republicans, violates the Equal Protection Clause of the Fourteenth Amendment.

94. The "dual circulator" provision of 10 ILCS 5/10-4 violates Intervenors' right to equal protection under the law because this provision disparately and unequally creates an additional and unnecessary burden upon independent and new political party candidates, without a legitimate state interest in such a provision.

95. The "dual circulator" restriction in 10 ILCS 5/10-4 exposes independent and new political party candidates to a threat that their circulators may have engaged in conduct in violation of the "dual circulator" provision in 10 ILCS 5/10-4, and the subsequent invalidation of their ballot access petition signatures, when compared with established political party petitions for nomination at a primary, where established party candidates face no such risk whatsoever.

96. It is also a violation of Intervenors' rights to equal protection under the law when established party nomination petitions – petitions used not for election, but solely to allow a private non-governmental organization to select its candidates – are used to deny ballot access and "core political speech" to independent and new political party candidates, and to strike otherwise valid voter signatures, who organized and associated to support such candidates, and such denial is without due process and contrary to their First and Fourteenth Amendment rights.

## COUNT V
### Due Process Clause of the
### Fourteenth Amendment to the United States Constitution

1-96.  Intervenors reassert Paragraphs 1-96 as if fully stated herein.

97.  The "dual circulator" provision in 10 ILCS 5/10-4 exposes independent and new political party candidates to a threat that their circulators may be disqualified based upon prior circulation for an established party candidate during the first election cycle, prior to the primary, and subsequent invalidation of all signatures upon such sheets circulated by persons who previously circulated for established party candidates, a risk that established party candidates do not face.

98.  Neither the Defendants, nor any election authority in Illinois maintains a database, registry, or other source that contains the names, addresses of circulators, and the political party of candidates for whom they circulated petitions within Illinois, or in other states, and it is not feasible for independent or new political party candidates to create such a database, or even to acquire this information before the start of independent and new political party petition circulation.

99.  Independent and new political party candidates would not know if their circulators forgot or lied about who they circulated for in the first election cycle before the primary, until after an objection was filed to their nomination papers, which would be during the week after 90-day period, when the signature petitions have already been filed.

100.  Candidate signature petitions cannot be amended or expanded after they are filed with Defendants or any other election authority.

29

101. Similarly, voters who sign candidate petitions have no knowledge of the circulator who presents a signature petition, or whether that person previously circulated a petition for an established party candidate six or so months prior, during the first part of the 2026 election cycle.

102. No notice, either through express words in the Election Code or otherwise, is provided to Intervenors with respect to the application of the "dual circulator" provision in 10 ILCS 5/10-4 to deny voters their right to sign petitions and exercise their First Amendment right to promote and see the candidates of their choice on the ballot, when, unbeknownst to the Intervenors and voters, some or all circulators for independent and/or new political party candidates may have previously circulated even so much as one sheet for an established political party candidate seeking nomination at that candidate's primary.

103. Independent and new political party candidates are not provided with the names, addresses, and candidates for circulators who have previously circulated petitions for established party party candidates, and Illinois does not require voters to register with or maintain allegiance to an established Illinois political party.

104. The circulation of ballot access signature petitions, particularly those directly for elected office rather than for a party's nomination, involves interactive communicative "core political speech" protected under the First and Fourteenth Amendments to the United States Constitution which is a fundamental right to which Due Process protections attach.

105. The "dual circulator" restriction in 10 ILCS 5/10-4 creates a hidden and additional requirement to be eligible for circulation of ballot access petitions for independent and new political party candidates that is inconsistent with the

30

enacted and stated requirements for petition circulators contained in 10 ILCS 5/10-4 which, defines those eligibility requirements as being a US citizen and over 18 years of age on the date of a primary nomination or general election.

106.    The application of the "dual circulator" provision of 10 ILCS 5/10-4 to Intervenors' signature petitions, without notice to Intervenors of the names of circulators who have previously circulated petitions for established party candidate nominations during the first election cycle of the 2026 election denies Intervenors their right to due process, and creates a situation for which Intervenors, despite their best efforts, could lose entire sheets of otherwise valid signatures if a circulator is found to have previously circulated, without any ability to avoid this situation.

107.    The application of the "dual circulator" provision of 10 ILCS 5/10-4 will not be known to Intervenors until after their candidate ballot access petitions are filed, at which time Intervenors are unable to cure or correct any deficiencies in their signature petitions; this after-the-filing application of the "dual circulator" provision of 10 ILCS 5/10-4 violates Intervenors' right to due process under the law, and denies a meaningful and realistic opportunity to avoid the effects of the "dual circulator" restriction in 10 ILCS 5/10-4 at or before the start of the petition circulation period, which started February 25, 2026.

108.    Intervenors assert constitutional violations that are capable of repetition yet evading review, both because there is no method for avoiding the penalty striking of entire sheets of valid voter signatures, and because the penalty striking is not disclosed or known to independent and new party candidates until after their petitions are filed, during the objection process, when such candidates

31

are unable to amend or avoid the objection process or its impacts upon their candidacy, which may include removal from the general election ballot. At that point in time, aspiring new political parties have likely exhausted their volunteers and financial resources, rendering a constitutional court challenge infeasible.

**COUNT VI**
**The cumulative effect of Illinois law creates an unconstitutional abridgment of rights under the First & Fourteenth Amendments to the Constitution**

1-108. Intervenors reassert Paragraphs 1-108 as if fully stated herein.

109.     The Election Code imposes far greater requirements upon independent and new political party candidates than needed to satisfy State concerns about ballot overcrowding, voter confusion, and frivolous candidates, as historically confirmed by the absence of independent and new political party candidates from elected office in Illinois, and they have rarely been able to overcome the obstacles to ballot access.

110.     There is no legitimate governmental purpose that is served by the "dual circulator" provision in 10 ILCS 5/10-4 and it has no impact or bearing on the administration of elections in Illinois, without the "dual circulator" restriction.

111.     The cumulative effect of the Election Code as applied to independent and new political party candidates, including a ten to fifteen times higher signature requirement within the same 90-day duration as established party candidates seeking nomination at a primary, with each signature page requiring a notarial *jurat*, is more than adequate to address any concerns of the Defendants or election authorities to administer elections.

112.     The "dual circulator" provision in 10 ILCS 5/10-4 along with the cumulative effect of other provisions of the Election Code, creates an

32

unconstitutional barrier to ballot access and denial of "core political speech" in violation of the Intervenors' and all independent and new political party candidates' First and Fourteenth Amendment rights under the US and Illinois Constitutions.

## PRAYER FOR RELIEF

WHEREFORE, Intervenors respectfully request that this Court enter findings and an order as follows:

A.      A finding declaring that the "dual circulator" provision in 10 ILCS 5/10-4 as excluding entire sheets of voter signatures contained upon petitions circulated by a circulator who previously circulated nomination petitions for established party candidates, whether in Illinois or outside the State, as a violation of the Due Process Clause of the Fourteenth Amendment and an unconstitutional impairment of core political speech under the First and Fourteenth Amendments to the United States Constitution;

B.      The entry of a permanent injunction enjoining Defendants and all electoral boards from enforcing the "dual circulator" provision in 10 ILCS 5/10-4 to signature petitions filed by independent and new political party candidates as a violation of the Due Process Clause of the Fourteenth Amendment and an unconstitutional impairment of core political speech under the First and Fourteenth Amendments to the United States Constitution;

C.      The entry of a permanent injunction enjoining Defendants and all electoral boards from enforcing the "dual circulator" provision in 10 ILCS 5/10-4 as to independent and new political party candidates as a violation of the Equal Protection Clause of the Fourteenth Amendment and unconstitutional impairment

33

of core political speech under the First and Fourteenth Amendments to the United States Constitution;

D. A finding declaring that enforcement of the "dual circulator" provision in 10 ILCS 5/10-4 as applied to independent and new political party candidates is unconstitutional under the Due Process Clause of the Fourteenth Amendment and/or an unconstitutional impairment of core political speech under the First and Fourteenth Amendments to the United States Constitution;

E. A finding declaring that enforcement of the "dual circulator" provision in 10 ILCS 5/10-4, to the extent it prohibits ballot access petition circulators who circulated ballot access petitions for Illinois primary candidates from circulating ballot access petitions for the Illinois general election for independent and new political party candidates who did not seek to nor enter the Illinois' primary election contests, is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment and/or an unconstitutional impairment of core political speech under the First and Fourteenth Amendments to the United States Constitution;

F. The entry of a permanent injunction enjoining Defendants' enforcement of the "dual circulator" provision in 10 ILCS 5/10-4 as to nomination papers filed by Intervenors for the November 3, 2026 general election;

G. An award of damages in favor of Intervenors in an amount to be determined at trial, to compensate them in their endeavors losses from paying circulators to obtain far more signatures than the Election Code states in their effort to overcome the "dual circulator" provision;

34

H.      Awarding litigation costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988; and,

J.      Retaining jurisdiction over this action to enforce this honorable court's orders, and grant Intervenors any further equitable relief which may in the discretion of this Court to be necessary, proper and just.

Respectfully submitted:

 /s/  Christopher D. Kruger                     /s/  Andrew Finko

Christopher D. Kruger                  Andrew Finko
Law Office of Christopher Kruger       875 N. Michigan Ave.
2022 Dodge Avenue                      Suite 3100
Evanston, IL 60201                     Chicago, IL 60611
847.420.1763                           (773) 480-0616
chris@kruger-law.com                   Finkolaw@Fastmail.FM

35

## Verification pursuant to 28 U.S.C. § 1746

The undersigned, GARY PIERCE, declares and verifies under penalty of perjury under the laws of the United States of America that the facts contained in the foregoing Verified Intervenors' Complaint are true and correct.

By: _____

Gary Pierce

**<u>Verification pursuant to 28 U.S.C. § 1746</u>**

The undersigned, ALEJANDRO CABRERA declares and verifies under penalty of perjury under the laws of the United States of America that the facts contained in the foregoing Verified Intervenors' Complaint are true and correct.

By: _____

Alejandro Cabrera

## Verification pursuant to 28 U.S.C. § 1746

The undersigned, RICHARD J. WHITNEY on behalf of the INDEPENDENCE PARTY, declares and verifies under penalty of perjury under the laws of the United States of America that the facts contained in the foregoing Verified Intervenors' Complaint are true and correct.

INDEPENDENCE PARTY

By: _____

Richard J. Whitney

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TEAM KENNEDY, LIBERTARIAN PARTY OF ILLINOIS, ROBERT F. KENNEDY JR., WILLIAM REDPATH, and ANGEL OAKLEY | ) ) ) | |
| | ) | No. 24-cv-7027 |
|     Plaintiffs, | ) | |
| vs. | ) | |
| | ) | Hon. John Kness |
| ILLINOIS STATE BOARD OF ELECTIONS, and, BERNADETTE MATTHEWS, in her official capacity as the Executive Director of the Illinois State Board of Elections, | ) ) ) ) | Magistrate Judge Jeannice Appenteng |
| | ) | |
|     Defendants. | ) | |
| _____ | ) | |
| INDEPENDENCE PARTY, GARY PIERCE, and ALEJANDRO CABRERA, | ) ) | |
| | ) | |
|     Intervenor-Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| ILLINOIS STATE BOARD OF ELECTIONS, and, BERNADETTE MATTHEWS, in her official capacity as the Executive Director of the Illinois State Board of Elections, | ) ) ) ) ) | |
| | ) | |
|     Intervenor-Defendants. | ) | |

**<u>Intervenor-Plaintiffs' Emergency Motion For Preliminary Injunction</u>**

Christopher D. Kruger
Law Office of Christopher Kruger
2022 Dodge Avenue
Evanston, IL 60201
847.420.1763
chris@kruger-law.com

Andrew Finko
875 N. Michigan Ave.
Suite 3100
Chicago, IL 60611
(773) 480-0616
Finkolaw@Fastmail.FM

Intervenor-Plaintiffs, Independence Party, Gary Pierce, and Alejandro Cabrera, through their attorneys, file their motion for preliminary injunction and respectfully request expedited consideration of this motion and a decision prior to the Intervenors' ballot access (voter signature) petition filing which occurs during the designated week of May 18-26, 2026. Intervenors respectfully request entry of a preliminary injunction to enjoin the Defendants from enforcing the "dual circulator" restriction in 10 ILCS 5/10-4 as being an unconstitutional abridgement of Intervenors' and voters' First and Fourteenth Amendment rights to ballot access.

## A.      Introduction.

Intervenor-Plaintiffs, are a political organization and its candidates for Governor and Lt. Governor, who aspire to become an established political party by circulating ballot access petitions to collect 50,000 voter signatures during the 90-day duration defined in the Election Code[1], with the intention of filing their ballot access petitions during the allowed filing period of May 18, 2026 – May 26, 2026. Intervenor-Plaintiffs, Independence Party, Gary Pierce, and Alejandro Cabrera respectfully request expedited and/or emergency consideration of their request for a preliminary injunction to prohibit Defendants from enforcing the "dual circulator" provision of 10 ILCS 5/10-4. Pursuant to FRCP Rule 24, Independence Party, Pierce and Cabrera have also filed their Motion to Intervene and proposed Intervenors' Complaint.

---

1   The Election Code was enacted and has been frequently amended by members of the Legislature that were elected as either Democratic and Republican candidates, without input from Independent or third party candidates, who have never been part of the Illinois Legislature; rather, Independent and New Political Party candidates have competed for ballot access and for election against these two established political parties and their efforts to maintain their control.

1

The "dual circulator" provision bars persons from circulating ballot access petitions for independent and new party (herein "I+NP") candidates for the sole reason that such a person previously circulated petitions for an established party candidate during the earlier circulation for the 2026 primary nomination process. Intervenors are currently gathering signatures, and expedited briefing and decision are respectfully requested prior to the petition filing period that starts May 18, 2026 and ends May 26, 2026.

Plaintiffs contend that the restriction upon circulation in 10 ILCS 5/10-4 is an unnecessary and unconstitutional restriction upon their right to seek ballot access, and unduly hampers their ability to gather the much higher number of signatures required for I+NP candidates.

Further, the "dual circulator" restriction is inconsistent with the express qualifications stated in the Election Code 10 ILCS 5/10-4 for who can circulate petitions, as it was revised through P.A. 92-0129 (eff. July 20, 2001), in part as follows:

[ * * * ] No signature shall be valid or be counted in considering the validity or sufficiency of such petition unless the requirements of this Section are complied with. At the bottom of each sheet of such petition shall be added a circulator's statement, signed by a person 18 years of age or older who is a citizen of the United States registered voter of the political division, who has been a registered voter at all times he or she circulated the petition, for which the candidate or candidates shall be nominated; [ * * * ]

Intervenors, Pierce and Cabrera, as well as other members of the Independence Party have circulated petitions for established party candidates without knowledge of the "dual circulator" restriction, and before Pierce and Cabrera decided to seek ballot placement. Indeed, this circulation was before the Independence Party commenced ballot access efforts. Intervenors Pierce and Cabrera are harmed and damaged by the "dual circulator" restriction because they cannot circulate their own ballot access

2

petitions.  See attached **Exh. A** Pierce declaration, and **Exh. B** Cabrera declaration.

When petitions were being circulated for established party candidate nominations, the Independence Party did not exist. For example, supporters of the Independence Party who circulated for Republican candidates Jim Gelderman and Angel Oakley[2] would be prohibited from circulating for Pierce and Cabrera if the "dual circulator" provision was enforced, as are Gelderman and Oakley barred themselves. *See* attached **Exh. C** Whitney declaration, **Exh. D** Oakley declaration.

B.      **Relevant Facts + Election Code Provisions[3].**

For the November 3, 2026 election, I+NP candidates for statewide office including Governor and Lt. Governor are required to file ballot access petitions containing *at least* 25,000 signatures of registered voters no later than May 26, 2026 in order to appear on the ballot.  Intervenors will file their ballot access petitions with the Defendant, ISBE, and thereafter such petitions cannot be amended or supplemented.

After ballot access petitions are filed, a single registered voter may file an objector's petition with the ISBE to object to the Intervenors' filing by June 2, 2026. Voters who file an objection petition are referred to as "objectors" and historically one of the established parties have financed and advanced objections to I+NP party candidates.  Most objector's petitions attack line-by-line voter registration addresses and voter signatures, in order to disqualify voters, so the total signature count after review by the ISBE is

_____

2    Oakley is a plaintiff in the original complaint Dkt#01, as an aggrieved voter that asserted her First amendment right to ballot access as an independent presidential Elector at the 2024 presidential election.

3   Intervenors' proposed Complaint sets forth Election Code provisions governing I+NP candidates.

3

reduced below the minimum required 25,000 voters[4].

After an objection is filed to a statewide candidate, the ISBE undertakes a "records exam" which compares the voter addresses and signatures on the ballot access petitions to the ISBE's voter database to determine if each objected voter is registered at the address written, and if the voter's handwritten signature matches the digital signature image "clip" stored in the database. Signers that are not found in the database or whose signatures do not match, are stricken (without notice to the voters or ability to cure) and are not counted toward the Intervenors' required minimum of 25,000.

The "dual circulator" restriction in 10 ILCS 5/10-4 imposes an additional obstacle to ballot access that applies to I+NP candidates, only, as follows:

> Provided, further, that no person shall circulate or certify petitions for candidates of more than one political party, or for an independent candidate or candidates in addition to one political party, to be voted upon at the next primary or general election, or for such candidates and parties with respect to the same political subdivision at the next consolidated election.

Established party candidates are not impacted by the "dual circulator" restriction because they circulate during the first part of the election cycle, and are not impacted by a prior circulator restriction – they are the first to hire professional paid circulators, and enlist experienced circulators. See definition of "election cycle" in 10 ILCS 5/9-1.9.

In addition to line-by-line objections to specific voters, objectors may also separately

_____

4   I+NP candidates typically gather twice the number of the stated minimum number of signatures to provide a "safety margin" to survive the objection process, which removes voters from the final counted of petition signers. Handwriting variations are common on election petitions since fewer voters are taught cursive handwriting, fewer have a unique signature, and far fewer voters use handwriting in their daily lives, combined with the hurried nature of signing a signature upon a clipboard held with the voter's other hand. Not all signatures are thus counted, and a safety margin is needed to overcome the potential loss of otherwise voter signatures.

seek to strike entire sheets of otherwise valid voter signatures within Intervenors' ballot access petitions ("sheet objections") based upon the "dual circulator" restriction, if a circulator for I+NP candidate had circulated a nomination petition for an established party candidate during the first half of the election cycle.

"Sheet objections" place Intervenors at risk of losing up to 12 voter signatures per sheet, since each of Intervenors' signature petitions sheets has 12 signature lines[5]. Such sheet objections arise from the imputed political party affiliation of a petition circulator who circulated for an established party nomination during the party's nomination process that occurred prior to the time I+NP candidates circulate. Candidates are unable to reliably prevent such "dual circulator" objections despite screening would-be circulators – many simply do not remember, some may lie, and others may be sent by an established political party to garner the I+NP candidate's reliance upon signatures that would draw an objection and tie up the candidate in an electoral board proceeding. The terms of the "dual circulator" provision are also very general; however, rather than narrowly construing this restriction, the Defendants have broadly imputed a political party affiliation to circulators, even where the prior circulation was in a different state (governed by its own ballot access laws), and where the circulator was not a voter or "qualified primary elector" in Illinois (ie not a voter eligible to sign a candidate petition, or participate in a party's primary). See e.g. underlying electoral board proceeding *Joseph Duffy & Zach Koutsky v. Robert F. Kennedy, Jr & Nicole Shanahan*, No. 24 SOEB GE 508.

---

5   The Election Code does not define the number of signature lines per ballot access petition, but candidates typically use petitions with 10, 12, or perhaps 15 signature lines for letter sized paper, taking into account sufficient space to hand write names and addresses.  Some candidate elect to use legal sized sheets of paper, that allow for 20 or so signature lines.

5

Ballot access is a considerable hurdle for aspiring new political parties in Illinois, however, placement on the ballot does not create established party status. To achieve established party status, a new political party's statewide candidate would need to receive at least 5% of the vote statewide at the general election[6]. *See* 10 ILCS 5/7-2, 10-2.

Each state maintains its own ballot access laws governing how a political party gains established party status, and each state governs its own elections. Thus, no political party, resident of a different state, or candidate running for a political party organized outside Illinois could ever file ballot access papers in Illinois, or participate in an Illinois election. In other words, there is no support for any extra-territorial application of Section 10-4 to be found in the Illinois Election Code, which confers no such jurisdiction, even if the provision was found to be constitutional. The "dual circulator" restriction, however is clearly violative of *Meyer v. Grant* and its progeny, see discussion *infra*.

Thus the Legislature could not have contemplated, or intended, the application of the "dual circulator" restriction in 10 ILCS 5/10-4 to encompass political parties established pursuant to laws governing other states. Similarly, the Legislature could not enacted a law to impute a political party affiliation to an out-of-state resident who was not registered to vote anywhere, and not eligible to be an Illinois "qualified primary elector" or participate in Illinois' political party candidate selection process.

The "dual circulator" restriction in Section 10-4 does not provide notice to candidates or circulators that its application could or would encompass ballot access

_____

6  A new political party may also be established within a district less than the entire state, if a district-wide candidate achieves at least 5% of the vote in that district.

6

activities *outside* of Illinois, and that such extra-territorial activity could be the basis for "sheet objections" to invalidate entire sheets of otherwise valid voters within an I+NP candidate's ballot access petitions, without notice to such voters either. See Declarations of Gary Pierce and Alejandro Cabrera.

Notably, there is no procedure or method to ensure that a well-funded established party would not engage in sabotage of petitioning drives by purposefully inserting their own circulators, who previously circulated for an established party candidate, into their opponents, I+NP candidates' campaign.

## C.      Requirements for Issuance of a Preliminary Injunction.

To obtain a preliminary injunction, Intervenors must show the following: "(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014) (citing *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011)). See also  *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007). "If this showing is made, 'the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest.'" *Id.* (quoting *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013)).

The "equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor." *Id.* See also *Merrill Lynch, Pierce, Fenner & Smith v. Salvano*, 999 F.2d 211, 214 (7th Cir. 1993).

The First and Fourteenth Amendments afford candidates vying for elected office and their supporting voters the fundamental right to associate for political purposes and to participate in the electoral process. See, e.g., *Clingman v. Beaver*,

7

544 U.S. 581, 586 (2005); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 787-88 (1983); *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). Ballot-access requirements that place more burdensome restrictions on certain types of candidates than on others implicate rights under the Equal Protection Clause as well. See *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).

This framework establishes a "flexible standard," according to which "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged restriction burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. Under this standard, "reasonable, nondiscriminatory restrictions" are subject to less exacting review, whereas laws that imposes "severe" burdens are subject to strict scrutiny. See *id.* (citations omitted). But in every case, "However slight [the] burden may appear ... it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion County Election Bd.*, 553 US 181, 128 S.Ct. 1610, 1616 (2008) (citation and quotation marks omitted).

Defendants have no such legitimate, actual *state interest* for enforcing the "dual circulator" restriction in 10 ILCS 5/10-4, and striking entire sheets of otherwise valid petition signers denies their right to associate and support their candidates.

As the Seventh Circuit has explained, "[m]uch of the action takes place at the first stage of *Anderson's* balancing inquiry," because the severity of the burden imposed is what determines whether strict scrutiny or a less demanding level of review applies. *Stone v. Board of Election Com'rs for City of Chicago*, 750 F.3d 678, 681 (7th Cir. 2014) (citing *Burdick*, 504 U.S. at 534).

Intervenors have met the requirements for injunctive relief, as they have no

8

adequate remedy at law for denial of their First Amendment right to associate through the unconstitutional restriction of their right to ballot access, and the wholesale denial of voters their right to support the candidates of their choice and see their candidates' names upon the general election ballot.

There is no cost or burden involved to the Defendants, and no impact upon the Defendants or any election authority should this honorable court agree to issue a preliminary injunction. The balancing of harms also weighs heavily in favor of Intervenors, since the Election Code already imposes excessively burdensome requirements upon I+NP candidates, and the "dual circulator" restriction in 10 ILCS 5/10-4 is not necessary for any reasonable, legitimate, and actual state interest. This is confirmed by the well-known reality that Illinois is largely a one-party controlled state, and has had few I+NP candidates ever appear on the ballot.

D.     **Injunctive relief requested.**

Plaintiffs respectfully request that this Honorable Court enjoin the Defendants from enforcing the "dual circulator" restriction contained in 10 ILCS 5/10-4 for Independent and New Party candidates, until such time as a decision on the merits is issued.

Respectfully submitted:
 /s/ Christopher D. Kruger

Christopher D. Kruger                    Andrew Finko
Law Office of Christopher Kruger         875 N. Michigan Ave.
2022 Dodge Avenue                        Suite 3100
Evanston, IL 60201                       Chicago, IL 60611
847.420.1763                             (773) 480-0616
chris@kruger-law.com                     Finkolaw@Fastmail.FM

9

## Certificate of Service

I, the undersigned attorney, certify that on April 4, 2026 the undersigned electronically filed the foregoing filing with the Clerk of the District Court, Northern District of Illinois, Eastern Division, using the CM/ECF system, which sends an email with a download link of this filing to all counsel of record.


/s/  Andrew Finko

10

# EXHIBIT B-1

Declaration of Gary Pierce

1. My name is Gary Pierce. I currently reside at 2908 S. 14th St., Springfield, IL 62703. I am a longtime registered voter in the State of Illinois.

2. I am currently currently running for Governor in the State of Illinois as a candidate for the Independence Party, a new political party formed in 2025, and considered a "new party" under Illinois election law.

3. In the Fall of 2025, I helped collect petition signatures from Illinois voters in support of a Democratic Party candidate for county board in Sangamon County, Sam Cahnman. At that time, I was not planning on running for governor, and the Independence Party had not yet even decided whether it would seek to run a candidate for governor. It had only had some preliminary discussions on that subject.

4. At the time that I was circulating Mr. Cahnman's petition and obtaining signatures in support of his placement on the ballot, I was not aware that this would later prohibit me from circulating petitions on behalf of Independence Party candidates in the 2026 General Election, under the so-called "dual circulator" rule in the Illinois Election Code. Had I been aware of the rule at the time, I would not have gathered signatures for Mr. Cahnman -- or, I may have sought to challenge the rule in court at that time.

5. My decision to help Mr. Cahnman obtain signatures from voters in order to get on the Democratic Party primary ballot for county board in the March 2026 primary election, did not, and does not, signify that I am a member or supporter of the Democratic Party or identify as such. In fact, I do not identify as a Democrat and do not support the Democratic Party generally. I am committed to, and support, the Independence Party. I simply thought that Mr. Cahnman was a good candidate for that particular office at that particular time, and thought that it was in the best interest of our county government to have him on the ballot as a candidate.

6. As a result of the "dual circulator" rule, I am now barred from gathering petition signatures for Illinois voters in support of my own placement on the ballot for governor in the 2026 General Election. To be more precise, if I were to gather such signatures, any such signatures obtained would have to be stricken and would not count toward the total submitted to the State Board of Elections in support of my candidacy and ballot placement. This materially harms my campaign and prospects for ballot placement. But for this rule, I would personally be willing and able to gather hundreds of petition signatures from Illinois voters in support of my own placement on the ballot.

Page 1 of 2

I, Gary Pierce, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on 2/28/2026          Signed: _____
(date)

1

# EXHIBIT B – 2

# EXHIBIT B-3

Declaration of Richard J. Whitney

1. My name is Richard J. Whitney. I currently reside at 1801 New Era Road, Carbondale, IL 62901. I am a longtime registered voter in the State of Illinois.

2. I am currently serving as chair of the Independence Party, a new political organization formed in 2025 that aspires to attain the status of becoming a "political party" and/or "established political party" within the meaning of Articles 7 and 10 of the Illinois Election Code.

3. Although the Independence Party has its own political principles, program and agenda, and is now running campaigns for public office under our own party name, our rules allow for members to form caucuses within either of the two established political parties in Illinois, and even to run as candidates under either the Republican or Democratic party banners, provided that they adhere to our principles of unity.

4. Accordingly, two of our members are currently running for public office as candidates of the Republican Party – Jim Geldermann, who is running for the Illinois General Assembly in the 17th State Representative District, and Angel Oakley, who is running for U.S. Representative in the Third Congressional District.

5. Geldermann and Oakley both gathered petition signatures from Illinois voters in the Fall of 2025 in order to successfully gain placement on the ballot in the March 17, 2026 Republican Primary Election. As a consequence of this, both Geldermann and Oakley are now barred from gathering petition signatures from Illinois voters in support of our candidate for governor, Gary Pierce, and for lieutenant governor, Alejandro Cabrera, gaining a place on the ballot in the November 3, 2026 General Election. This is due to the "dual circulator" prohibition contained in section 10-4 of the Election Code, 10 ILCS 5/10-4.

6. All volunteers for Geldermann and Oakley who obtained petition signatures from voters on their behalf in the Fall of 2025, are also now barred from gathering petition signatures for Pierce and Cabrera. This includes Mr. Cabrera himself, as he gathered petition signatures in support of Oakley's candidacy. Mr. Cabrera was unaware of the potential impact of the "dual circulator" prohibition at the time, nor would he have known at the time that the Independence Party would later decide to run a gubernatorial campaign for the General Election and that he would be selected as the party's lieutenant governor candidate.

7. The Independence Party did not decide to run a candidate for governor until its January 13, 2026 membership meeting. It selected Mr. Pierce as its candidate at that meeting. It selected Mr. Cabrera as its lieutenant governor candidate at a membership meeting on January 27, 2026.

Page 1 of 5

8. On information and belief, at least some of the other volunteers for the Oakley and/or Geldermann campaigns would be willing and able to help gather petition signatures for Pierce and Cabrera, but for the "dual circulator" prohibition.

9. Other members of our party are also barred by the "dual circulator" prohibition from gathering petition signatures from Illinois voters in support of Pierce and Cabrera's efforts to secure ballot placement in the November 3, 2026 General Election. These include Mr. Pierce himself, since he had previously gathered petition signatures in support of a Democratic Party candidate for the Sangamon County Board in the Fall of 2025.

10. Undoubtedly there will be other volunteers and supporters of the Pierce/Cabrera campaign who will be unable to circulate petitions on their behalf due to the "dual circulator" prohibition. Thus, the "dual circulator" prohibition materially harms the Independence Party, its candidates and all Illinois voters who wish to have the opportunity to cast their vote in favor of our candidates for governor and lieutenant governor. It may well make the difference between Pierce and Cabrera being able to successfully gather the 25,000 valid signatures required, and falling short of that goal.

11. I am familiar with the case of *Citizens For John W. Moore Party v. Bd. of Election Comm'rs of City of Chicago*, 794 F.2d 1254 (7th Cir. 1986), and its rationale for upholding the "dual circulator" prohibition as being necessary to promote "the cohesion of political parties," since circulators are the "cadre of any political movement," and serve as party "agents" for the electoral season. *Id.* at 1260. Perhaps this characterization of the role played by circulators had a greater degree of accuracy 40 years ago, or perhaps there were facts peculiar to that case that supported this premise underlying the Seventh Circuit's opinion, but this premise does not comport with contemporary reality and practice, at least not for the majority of circulators.

12. I have been personally involved in numerous ballot-access petition drives, both as a candidate and as a supporter of various candidates, since 2000. Although some circulators are motivated by party loyalty, the reality is that the majority are not. For one thing, a large percentage of circulators are paid circulators, who may or may not actually support the party or even the candidate on whose behalf they are circulating petitions. Their principal motivation is to get paid for their work.

13. Even among volunteer circulators, not all engage in this activity out of party loyalty; many just wish to support a particular candidate for office because of the positions or qualities of that candidate, irrespective of party affiliation. From my own interactions with voters, I can say that the expressed view, "I vote for the candidate, not the party," is a very

Page 2 of 5

popular sentiment. It stands to reason that this sentiment would also be reflected among voters who are sufficiently motivated to circulate a petition for candidates they support. Such voters may thus be motivated to circulate a petition for an established party candidate for one office, but may be no less motivated to circulate a petition for an independent or "new party" candidate for a different office.

14. Thus, the "cadre" theory of the role played by circulators does not comport with the actual motivations of most circulators. Simply because Mr. Pierce, for example, happened to favor a Democratic Party candidate for one county board seat does not signify that he favored any Democratic Party candidate for governor. His decision to help one established party candidate for county board should not bar him from supporting a candidate from a new party – in this case, himself – for an entirely different office, especially when the decision to support the Democratic county board candidate did not in any way signify that he was volunteering to be part of the Democratic Party's "cadre" or to serve as an agent of the Democratic Party for the entire election cycle.

15. Similarly, in circulating petitions in support of Angel Oakley's candidacy, Mr. Cabrera simply wanted to support the campaign of a member of our party who decided to run as a Republican in the primary, in order to avoid the far more daunting, if not prohibitive, ballot-access requirements imposed on "new party" or independent candidates. He was motivated to support Ms. Oakley, not the Republican Party generally. His decision did not in any way signify that he was volunteering to be part of the Republican Party's "cadre" or to serve as an agent of the Republican Party for the entire election cycle.

16. Mr. Pierce's and Mr. Cabrera's circumstances illustrate the utter absurdity of the "dual circulator" prohibition. The rule is supposed to promote party "cohesion" but neither of these circulators were committed to the Democratic or Republican parties for this election cycle in the first instance. In fact, they are now candidates of an incipient party that will be opposing the gubernatorial candidates of the Democratic and Republican parties. The Election Code does not bar them from doing this, and yet it bars them from collecting signatures from voters in support of their campaigns. This does not, in any respect, promote party cohesion.

17. The dual circulator prohibition fails to take into account that many volunteer circulators may fall into this category, of persons supporting an individual established party candidate without necessarily supporting the established party itself. Thus, the prohibition primarily harms independent or new party candidates, not established party candidates. It would be rare for someone to wish to circulate petitions for both a Democratic and a Republican candidate for public office in the same primary election petitioning period. It is a more common occurrence for someone to circulate petitions for either a Democratic or a

Page 3 of 5

Republican candidate for public office in the primary election period and then wish to circulate a petition for an independent or new party candidate, for a different office, months later.

18. Additionally, given that the petition circulation period for independent and new party candidates in the general election occurs months after the petition circulation period for the established party primary election, indepependent and new party candidates are disadvantaged in another respect. Given that there is a finite pool of both paid and volunteer prospective circulators, the established parties are allowed to exhaust much of that pool before independent and new party candidates can even begin to recruit circulators from that pool.

19. Even assuming, *arguendo*, the dubious proposition that there is some State interest in maintaining the cohesion of political parties by restricting the freedom of persons presumed to be party "cadre" (by virtue of their circulating even one petition for one established party candidate for one office), the dual circulator prohibition fails to take into account parties like ours, which permits support for individual established party candidates.

20. There is yet one other way in which the "dual circulator" prohibition harms us. The Independence Party has established relationships with independent candidates running for various offices, such as for U.S. Representative in the 11th Congressional District and State Senator in the 59th State Senate District. Even though these candidates are not endorsed candidates of our party, we are not running candidates of our own for those offices, are not in competition with them, and we are generally supportive of them winning a place on the ballot, in the interest of voters having more and probably better choices on the ballot. Our interests therefore align, and we had considered making arrangements in which we would help these candidates circulate their petitions in exchange for their supporters circulating ours. Yet the dual circulator rule bars such mutually beneficial arrangements, since it prohibits persons from circulating petitions "for an independent candidate or candidates in addition to one political party." 10 ILCS 5/10-4.

21. Here again, our support for these independent candidates, and their support of ours, does not in any way affect our ability to maintain party "cohesion." All it does is further limit the available pool of potential circulators.

22. How the Independence Party maintains cohesion is our own concern, and we neither want, nor need, nor have we sought, the assistance of the State in this regard. For the Independence Party, the dual circulator prohibition provides no benefit. It does not help us maintain "cohesion." It only inflicts harm and violates our freedom of association. It does

Page 4 of 5

so by barring some of our members and supporters from circulating petitions on behalf of our candidates, merely because they happened to support an established party candidate, for an entirely different office, and for an entirely different election, months earlier in the election cycle.

23. The impairment of our associational rights by the dual circulator rule is amplified by the fact that it comes in the context of ballot-access petitioning requirements that are already onerous in the extreme and manifestly unfair. As the Court is aware, new party candidates for statewide office must collect 25,000 signatures from Illinois voters in 90 days – five times the number required for established party candidates. Due to the near-certainty of challenges from private objectors, and due to the fact that many petition signers are mistaken about whether or at what address they are registered to vote, independent and new party candidates for statewide office, as a practical matter, must generally aim to collect about twice the required number of signatures, in order to reasonably ensure that their candidate filing will survive the challenge. Viewed in this context, the dual circulator rule adds another layer of oppression on top of a ballot-access regimen that already substantially burdens the rights of independent and new party candidates, and of the voters who wish to see them elected to office.

I, Richard J. Whitney, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on __March 21, 2026__
(date)

Signed: _____

# E X H I B I T   B – 4

DECLARATION OF ANGEL OAKLEY

I am making this Declaration to inform the Court of my status as a candidate, petitioner circulator and voter during the pendency of the litigation known as case no. 24 cv 7027, Northern District of Illinois, and continuing to the present day.

I have personal knowledge of all the events and facts in this declaration, and if called to testify I could truthfully and competently state:

When this litigation commenced I was a candidate for presidential elector on behalf of Robert F Kennedy Jr.

At that time I circulated petitions for Robert F Kennedy Jr. I also assisted his campaign at the records examination in Springfield following the objection to his candidacy being filed.

All of these efforts expanded resources and time including financial resources and time traveling, motels, meals, and miscellaneous costs and supplies.

At that same time in 2024, although it is not reflected in the current complaint, I was also an independent candidate for Congress.

I circulated petitions on behalf of my congressional candidacy. I unsuccessfully defended an objection and therefore was not on the ballot.

In perhaps the oddest event of my congressional campaign a justice of the Illinois appellate court, a member of the Democratic Party, confronted my circulators and told them that the signatures they were collecting wouldn't count if they voted in the primary election.

The court can take judicial notice of this as my candidacy is of record as is the objection filed with the election board.

I was unable to secure enough signatures to get on the ballot as an independent candidate because of the burdensome provisions of the Illinois Election Code that are being challenged in this

lawsuit, including the private challenge system, the large number of signatures needed for independents and third parties, the dual circulator prohibition and the relatively short time to collect signatures.

There is no way for a candidate to know if a circulator has prior circulated for another candidate. This is another factor that makes the prohibition very unfair.

In addition many of the circulators themselves are not aware of the prohibition, as how could they be?

As a result I was damaged financially and reputationally and my supporters as well as myself lost trust and faith in the fairness of the democratic process.

I am again a candidate for Congress in the U.S. House of Representatives; however now I am running as a Republican.

I made this choice as much or more as a practical matter than as an ideological one.

I am informed that there are persons who wish to intervene in this lawsuit to challenges these same Elections Code provisions. I have no objection to these persons nor any other persons intervening to challenge these provisions that I consider to be unduly burdensome, oppressive, and violative of the right to run for office and vote effectively.

Further Declarant sayeth not.

_____          3/30/2026

Angel Oakley                           Date

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

TEAM KENNEDY, LIBERTARIAN PARTY )
OF ILLINOIS, ROBERT F. KENNEDY JR., )
WILLIAM REDPATH, and ANGEL OAKLEY )
                                  )    No. 24-cv-7027

      Plaintiffs, )

vs. )

                                  )    Hon. John Kness

ILLINOIS STATE BOARD OF ELECTIONS, )
and, BERNADETTE MATTHEWS, in her )    Magistrate Judge
official capacity as the Executive Director of )    Jeannice Appenteng
the Illinois State Board of Elections, )
                                  )

      Defendants. )
_____)
INDEPENDENCE PARTY, GARY PIERCE, and)
ALEJANDRO CABRERA, )
                                  )

      Intervenor-Plaintiffs, )

vs. )

                                  )

ILLINOIS STATE BOARD OF ELECTIONS, )
and, BERNADETTE MATTHEWS, in her )
official capacity as the Executive Director of )
the Illinois State Board of Elections, )
                                  )

      Intervenor-Defendants. )

**Intervenor-Plaintiffs' Memorandum of Law
in Support of their Emergency Motion for Preliminary Injunction**

Christopher D. Kruger
Law Office of Christopher Kruger
2022 Dodge Avenue
Evanston, IL 60201
847.420.1763
chris@kruger-law.com

Andrew Finko
875 N. Michigan Ave.
Suite 3100
Chicago, IL 60611
(773) 480-0616
Finkolaw@Fastmail.FM

Intervenor-Plaintiffs, Independence Party, Gary Pierce, and Alejandro Cabrera, file their memorandum in support of their motion for preliminary injunction and respectfully request expedited consideration of this motion, and a decision upon their preliminary injunction prior to the Intervenors' ballot access (voter signature) petition filing which occurs during the statutorily defined week of May 18-26, 2026.

A.      **Standard of review – First Amendment rights and preliminary injunction.**

The U.S. Supreme Court declared in *Reynolds v. Sims* that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362 (1964).

The First and Fourteenth Amendments afford candidates vying for elected office, and their voting constituencies, the fundamental right to associate for political purposes and to participate in the electoral process. See, e.g., *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 787-88 (1983); *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). Ballot-access requirements that place more burdensome restrictions on certain types of candidates than on others implicate rights under the Equal Protection Clause as well. See *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).

Circulation of ballot access petitions constitutes "core political speech" for which First Amendment protection is at its zenith. *Meyer v. Grant*, 486 U.S. 414 (1988).

Protecting core political speech from improper denial by Defendants has historically warranted court intervention and the granting of preliminary injunctive relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

In order to prevail on a motion for a preliminary injunction in the Seventh Circuit, the moving party must demonstrate: (1) a likelihood of success on the merits; (2) a lack of adequate remedy at law; and, (3) an irreparable harm will result if the injunction is not granted. *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007), quoting *Foodcomm Intern. v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003). If the party seeking the injunction meets all three requirements, the district court must then balance the relative harms that could be

caused to either party. *Lambert*, 498 F.3d at 451.

**B.**     **Argument.**

The "dual circulator" restriction within 10 ILCS 5/10-4 is unconstitutional on its face, and as applied to Intervenors and all Independent and New Party (herein "I+NP") candidates, because it is a both a "content-based" restriction, and also an "identity" restriction of First Amendment speech based upon the identity of the speaker as a Democrat or Republican. This restriction severely burdens I+NP candidate ballot access rights, denies otherwise valid voters the right to support the candidates of their choice and see their candidates' names upon the ballot, and imposes an unnecessary burden upon I+NP candidates in violation of their right to due process and equal protection.

This restriction is not based upon any legitimate actual state interest, or need for such a provision, and does not meet strict scrutiny review. Intervenors' challenge to the "dual circulator" restriction is amenable to immediate review and injunctive relief.

**A.**     **Plaintiffs are likely to succeed on the merits of their First Amendment claim.**

The Supreme Court has established the analytical framework to determine if the Election Code poses an unconstitutional restraint of First Amendment protected speech. *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). A statute that fails to advance a legitimate state interest is thus an unconstitutional restriction of First and Fourteenth Amendments ballot access rights.

Under the Election Code as it exists today, the State has zero interest in enforcing the "dual circulator" restriction in 10 ILCS 5/10-4 which (a) imposes additional and inconsistent, hidden requirements upon circulators; (b) imputes a political party identity to circulators (regardless of voter status or state residence) that is not otherwise authorized under the Election Code; (c) has no influence or impact upon the administration of elections, and (d) disparately impacts I+NP candidates that already face a greater burden to ballot access, without a need for such an additional restriction.

Under the test announced by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992), a ballot access restriction that is judged to be a severe burden on protected speech must be narrowly tailored to advance

a compelling governmental interest in order to survive constitutional scrutiny.

Notably, any burden on "core political speech" is a severe burden. The Supreme Court held that circulation is "core political speech." *Meyer v. Grant*, 486 U.S. 414, 424 (1988). Thus the "dual circulator" restriction upon circulation poses as severe burden.

Even assuming *arguendo* that the "dual circulator" restriction was not a severe burden, a ballot access restriction imposing a less than severe impairment on protected speech still must advance some state interest which is <u>important enough</u> to outweigh the burden it imposes on protected speech. Therefore, even a less than severe burden on speech must advance some legitimate and weighty state interest to survive constitutional scrutiny. No such state interest exists under the current Election Code.

As the Supreme Court explained in *Anderson*:

"[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." *Bullock v. Carter*, 405 U.S. 134, 143 (1972). Our primary concern is with the tendency of ballot access restrictions "to limit the field of candidates from which voters might choose." Therefore, "[i]n approaching candidate restrictions, it is essential to examine **in a realistic light** the extent and nature of their impact on voters." *Id.*

The impact of candidate eligibility requirements on voters implicates basic constitutional rights. Writing for a unanimous Court in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958), Justice Harlan stated that is "is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." In our first review of Ohio's electoral scheme, *Williams v. Rhodes*, 393 U. S. 23, 30-31 (1968), this Court explained the interwoven strands of "liberty" affected by ballot access restrictions:

"In the present situation the state laws place burdens on two different, although overlapping, kinds of rights — the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms."

As we have repeatedly recognized, voters can assert their preferences only through candidates or parties or both. "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues." *Lubin v. Panish*, 415 U.S. 709, 716 (1974). **The right to vote is heavily burdened if that vote may be cast only for major-party candidates at a time**

3

**when other parties or other candidates are "clamoring for a place on the ballot."** *Willimas v. Rhodes*, 393 U.S. 23, 31 (1968). The exclusion of candidates also burdens voters' freedom of association, because **an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for likeminded citizens.**

Although these rights of voters are fundamental, not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates. We have recognized that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects – at least to some degree – the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, non-discriminatory restrictions.

Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. *Storer* at 730. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It must then identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional."
[ * * * ]
As our cases have held, it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preferences, or economic status. "Our ballot access cases…focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the 'availability of political opportunity.'" *Clements v. Fashing*, 457 U.S. 957, 964 (1982) (plurality opinion), quoting *Lubin v. Panish*, 415 U.S. at 716.

A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendments. It discriminates against those candidates and – of particular importance – against those voters whose political preferences lie outside the existing political parties.

4

*Anderson*, 460 U.S. 780, 786-87, 793-95 (1983).

The Supreme Court further explained that the balancing analysis defined in *Anderson* requires that a ballot access restriction which imposes a "severe" restriction on rights must be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992). The Court added that only when a state election law provision imposes "reasonable, non-discriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, then "the State's important regulatory interest are generally sufficient to justify" the restriction. *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 788.

The "dual circulator" restriction is both an "identity" and a "content based" restriction – that somehow a person (who is not required to be a registered voter or eligible to participate in a primary) who circulated an established party petition for nomination is "locked-in" to the identity of being a Democrat or Republican. This "locked-in" circulator is then prohibited from later engaging in "core political speech" by circulating for and promoting the candidacies of I+NP candidates – a prohibited ***content-based*** restriction that bars I+NP speech. This restriction constitutes an impermissble "content-based" restriction in violation of the First Amendment. *Chiles v. Salazar*, 607 U.S. ___ (2026) (slip op. pgs. 8-9).

The penalty for violation of this content-based and identity speech restriction for persons identified as a Democratic or Republican circulator, is drastic. Although the penalty is not stated in the Election Code, the Defendants and other electoral boards have adopted the approach of striking, and not counting (or removing), entire sheets of otherwise valid voter signatures from I+NP candidates. This results in denial of First Amendment rights to both the Intervenors, and their petition signers.

The "dual circulator" restriction causes widespread harm at multiple levels – (a) it places I+NP candidates at risk of wholesale loss of entire sheets of signatures, with no procedure to safeguard the petitioning and avoid this minefield, (b) exposes I+NP candidates to an easily setup objection process orchestrated by an established political

party, which clouds the candidacy and deters fundraising, (c) potentially results in the denial of legitimate voters their right to associate and sign petitions for I+NP candidates, when entire sheets are stricken through no fault of the voters, and without notice or due process allowed, and (d) denies otherwise qualified I+NP candidates their right to ballot access at the general election, and their supporters' their right to be able to vote for and elect the candidates of their choice, rather than being forced to choose only an established party's selected nominee.

In addition, the "dual circulator" restriction in 10 ILCS 5/10-4 also violates the First Amendment because it prohibits speech based upon the identity of the speaker. *Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010). That is, a circulator is "locked-in" to being a Democrat or Republican for the entire election cycle by circulating a petition for a political party's nomination process.

Pierce and Cabrera circulated a few nomination sheets for Democratic and Republican candidates, and by operation of the "dual circulator" restriction, each is identified as a Democrat or Republican, despite their denial of such affiliations and identities. See Pierce and Cabrera declarations. Intervenors Pierce and Cabrera are now prohibited from circulating their own petition sheets, and are being denied their First Amendment right to unrestricted speech, based upon their Election Code-given identities. Such a prohibition on speech, based upon the Electon-Code imposed identity as being a Democrat or Republican, is an unconstitutional restriction upon Intervenors, Pierce and Cabrera's First Amendment rights. *Id.*

The Supreme Court recognized that securing sufficient signatures for ballot placement is no small undertaking, and "that few but the young have the strength, the ardor and the stamina to engage in it, unless, of course, there is some remuneration." *Meyer v. Grant*, 486 U.S. 414, 424 (1988). In *Meyer* the Supreme Court confirmed that circulation of ballot access petitions necessarily constitutes "core political speech" for which First Amendment protection is at its zenith. *Meyer v. Grant*, 486 U.S. 414 (1988).

The Supreme Court held Colorado's statute prohibiting payment of circulators to be unconstitutional, and noted that the State "has failed to demonstrate that it is necessary

6

to burden appellees' ability to communicate their message in order to meet its concerns." *Id*. at 426. Indeed, "legislative restrictions on advocacy of the election or defeat of political candidates are wholly at odds with the guarantees of the First Amendment." *Id*. at 428 quoting *Buckley v. Valeo*, 424 U.S. 1, 50 (1976).

As such, even less-than-severe burdens on the rights of voters to associate with candidates of their choice still demand some legitimate "important regulatory interest" to survive constitutional scrutiny. Restrictions on ballot access that are void of any *state* interest, therefore, are *always* unconstitutional if they impair rights guaranteed under the First and Fourteenth Amendments. Defendants may not enforce a ballot access restriction or apply an existing ballot access restriction in any manner which is not tethered to protecting an "important **regulatory** interest" of Illinois.

The "dual circulator" restriction in 10 ILCS 5/10-4 also imposes a severe restriction upon I+NP candidates by virtually eliminating professional paid circulators.

Established party candidates circulate petitions not for election, but rather for their own party's selection or nomination process. This selection in Illinois reaches the same result as a private caucus. A primary is the selection of a private entity's candidates (though publicly funded) at which no candidates are elected, and the use of petitioning for this private selection process against I+NP candidates to deny actual ballot placement for actual election, is a severe and unconstitutional burden.

Since this party selection process is also the first in time, established parties have no "prior" circulators to worry about, and do not face the same "dual circulator" obstacle. Being first to hire paid professional circulators, and first to enlist other experienced circulators is a huge advantage for established party candidates, which is denied by the "dual circulator" restriction for I+NP candidates and their circulators.

The "dual circulator" restriction not only restricts the content of speech that persons who previously circulated may convey (ie barred from promoting I+NP candidates), but significantly abridges the exercise of I+NP candidates' constitutional right to hire professional petition circulators as confirmed by the Supreme Court in *Meyer v. Grant*, 486 U.S. 414 (1988), and the additional speech protections extended by *Buckley v. Am.*

7

*Const. Law Found., Inc.*, 525 U.S. 182 (1999), *Citizens United v. FEC*, 558 U.S. 310 (2010) and *Chiles v. Salazar*, 607 U.S. __ (2026),

Applying the analysis defined in *Anderson* to the "dual circulator" restriction in 10 ILCS 5/10-4, which results in entire sheets of voters being denied their right to select the candidate of their choice (without notice or any due process), is a severe burden on Intervenors' and their supporting voters' First Amendment rights.

The striking of entire sheets of I+NP voter signatures, based upon prior circulation of an established parties' nomination petition "operate[s] as a mechanism to exclude certain classes of candidates from the electoral process and unfairly or unnecessarily burdens the 'availability of political opportunity' " thus "limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas." *Anderson*, 460 U.S. at 793-94.

Silencing voters' speech because, without their knowledge, the petition circulator who offered them a petition to sign, was "locked-in" by the Elction Code with the identify of being an established party member, is a severe, draconian, and unnecessary burden on I+NP candidates and their right to First Amendment protected speech.

I+NP statewide candidates are already burdened with the task of having at least 25,000 valid voter signatures collected within 90 days, after overcoming the objection petition process, for ballot placement and election at the general election. The much higher number of signatures, gathered within the same 90 day duration that established parties gather up to 5,000 signatures, standing alone, is more than sufficient to deter frivolous candidates, prevent ballot overcrowding, and to avoid voter confusion, the State's only legitimate interests. History confirms that Illinois has no independent elected officials, and few I+NP candidates have made the ballot, not because there are no independent voters or candidates in Illinois, but solely due to the overly restrictive provisions governing I+NP candidates.

Due to the "dual circulator" restriction and other requirements of the Election Code, I+NP candidates realistically have to submit about 50,000 signatures to be able to

8

overcome the objection process. As noted in *Meyer v. Grant*, supra, paid circulators are the only option for achieving this number of signatures within 90 days. However, paid circulators are not waiting for I+NP candidates – their business relies upon circulating as many petitions as possible, starting with established party nomination petitions.

The "dual circulator" restriction of 10 ILCS 5/10-4 applies to professional circulators, and restricts their circulators from circulating for I+NP candidates. The inability to hire professional circulators is a significant burden upon I+NP candidates to attain ballot access, and a corresponding limit on their quantum of speech.

Also, unlike Republican and Democratic candidates seeking access to their primary nomination process, I+NP candidates do not have the same ability to tap into a preexisting political organization of volunteers (or political party funds) to collect ballot access petitions. Historically, many public employees have also been under pressure to support partisan candidacies, thus indirectly discouraging most public employees from circulating for I+NP candidates. See *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Rutan v. Republican Party of Illinois* 497 U.S. 62 (1990).

In the aftermath of *Meyer*, *Buckley*, and *Citizens United*, discussed supra, as well as substantive changes to the Illinois Election Code which render the facts discussed in the *John Moore* cases incapable of repetition, the Defendants have no actual state interest in enforcement of the severe burden posed by the "dual circulator" restriction in 10 ILCS 5/10-4. See also, *Crawford v. Marion County Election Bd.*, 128 S.Ct. 1610, 1616 (2008) ("However slight [the] burden may appear ... it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.")

A primary candidate can no longer drop out or withdraw from the nomination process and then run in the General Election as an independent or new party candidate because the Election Code bars both "sore loser" candidates who lost their party nomination, and those who changed their mind and withdrew from their party's primary nomination. 10 ILCS 5/7-10; 10 ILCS 5/8-8; 10 ILCS 5/10-2; 10 ILCS 5/7-43. See also, *Citizens for John W. Moore v. Bd. of Elec. Com'rs*, 794 F. 2d 1254 at Fn.2.

Thus, to the extent that the dual circulator provision seeks to protect Illinois political

9

parties from factionalism, that was addressed more than sufficiently through many additional party protections added to the Election Code after *John Moore I & II. See Citizens for John W. Moore v. Bd. of Elec. Com'rs,* 794 F. 2d 1254 (7th Cit. 1986); *Citizens For John Moore Party v. Bd. of Election Com'rs,* 845 F. 2d 144 (7th Cir. 1988).

The analysis adopted by the Court of Appeals for the 7th Circuit in *Moore I & II* is no longer appropriate in light of many changes to the Election Code, nor consistent with subsequent Supreme Court holdings. The current Election Code defeats the *Moore* decisions' conclusion that Illinois has a legitimate regulatory interest in the conduct of petition circulation as "a middle ground between 'sore loser' and 'disaffiliation' statutes …on the one hand, and entirely open competition, on the other." *Citizens for John W. Moore Party v. Board of Election Com'rs of City of Chicago*, 845 F.2d 144, 145-146 (7th Cir. 1988) (internal citation omitted). As such, Intervenor-Plaintiffs are likely to succeed on the merits of their claim as applied to the "dual circulator" restriction.

**B.      Plaintiffs satisfy all requirement for a preliminary injunction.**

**1.      Plaintiffs will suffer continuing irreparable harm.**

As restrictions to "core political speech" are inherently irreparable, this prong is satisfied. Every day that Intervenors Pierce and Cabrera are prohibited from circulating their own petitions is a denial of "core political speech." As this Court is aware, the loss of First Amendment freedoms is irreparable harm, regardless of its duration. *Elrod*, 427 U.S. 347, 373; *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008 (7th Cir. 1990).

As the Court of Appeals for the Seventh Circuit has explained:

> . . . the impact of candidate eligibility requirements on voters implicates basic constitutional rights. The exclusion of candidates . . . burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens. Also, because voters can assert their preferences only through candidates or parties or both, . . . the right to vote is heavily burdened if that vote may be cast only for major-party candidates at a time when other parties or other candidates are clamoring for a place on the ballot.

*Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) (citations omitted).

10

**2.** **Plaintiffs have no adequate remedy at law.**

Defendants' enforcement of the "dual circulator" restriction in 10 ILCS 5/10-4 would prevent (a) Intervenors, Pierce and Cabrera, from collecting signatures themselves which is interactive communication concerning political change that is appropriately described as "core political speech" as well as (b) preventing many of their volunteers identified as Democrat or Republican due to prior circulation, from collecting signatures for Intervenors, (c) exposing Intervenors to the risk that circulators may have previously circulated and loss of those signatures, and (d) exposing Intervenors to an objection based upon the "dual circulator" restriction (whether inadvertent or through sabotage), without a reliable method of avoiding. Once the signature petitions are submitted and the Defendants convene as the electoral board, there will be no relief available, as Defendants will then cry "moot!"

This is a severe impediment to Intervenors' access to Illinois' general election ballot, and serves no important regulatory purpose. Only the requested injunction and declaratory relief would serve to protect rights guaranteed to Intervenors and their supporters. Money damages are an insufficient remedy for the loss of First Amendment freedoms. *See Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982) ("In [First Amendment] cases the quantification of injury is difficult, and damages are therefore not an adequate remedy."); *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of First Amendment violations because of the inadequacy of money damages."). Therefore, the only adequate remedy in this case is through equitable, injunctive relief.

**3.** **Balance of hardships favors issuance of a preliminary injunction.**

In the Seventh Circuit, the Court must consider "the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied," and "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992)

This factor involves what has been called "the 'sliding scale' approach: the more

11

likely it is the plaintiff will succeed on the merits, the less likely the balance of irreparable harms needs to weigh towards its side." *Id.* at 12. In this case, where Defendants have no legitimate regulatory interest in the dual circulator ban, there is no hardship visited upon Defendants that could outweigh the harm Intervenors will suffer if the requested injunction is not granted. Similarly, no election authority that administers elections is impacted by the "dual circulator" restriction, which has no effect on the administration of elections.

The irreparable harm Intervenors will suffer if the preliminary injunction is not granted is far greater that any hypothetical harm that Defendants may claim if the requested preliminary injunction is granted. As set forth above, there is a substantial First Amendment issue raised in this case. Intervenors are already harmed and damaged by the "content-based" and identity restrictions because Pierce and Cabrera cannot circulate, and are silenced and denied their First amendment right to "core political speech" by the Election Code. All Intervenors are further harmed by threatened denial of ballot access, if the "dual circulator" restriction in 10 ILCS 5/10-4 is enforced by Defendants through an electoral board proceeding.

Further, the dual circulation restriction is causing Intervenors unnecessary and increased legal costs, and petition gathering costs, that the injunction will truncate. Defendants, on the other hand, will suffer no harm if the injunction be granted.

### 4. A preliminary injunction serves the public interest.

Lastly, "[t]he public interest is clearly served by strong and vigorous protection of the First Amendment." *O'Brien v. Town of Caledonia*, 748 F.2d 403, 408 (7th Cir. 1984); *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363-64 (6th Cir. 1998); *ACLU of Ill.,* 679 F.3d at 590 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)) ("injunctions protecting First Amendment freedoms are always in the public interest.").

Furthermore, as discussed in *Anderson* and noted above, the requested injunction serves the public interest by protecting Intervenors' and their supporting voters' First Amendment rights by allowing them to fairly compete for a spot on the general election

ballot – more candidate choices benefit all voters, in a State that often has only one, or maybe a weak second candidate, for most offices elected at the general election.

### 5. No security required.

The Seventh Circuit has observed that security is not mandatory under Rule 65(c), and can be dispensed with in the discretion of the court. See *Scherr v. Volpe*, 466 F.2d 1027 (7th Cir. 1972); see also *Moltan Co. v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). Security is not needed, as there is no financial harm to Defendants.

### C. Conclusion.

Intervenor-Plaintiffs respectfully request that the Court preliminarily enjoin Defendants from enforcing the "dual circulator" restriction in 10 ILCS 5/10-4 for Independent and New Party candidates based solely on a circulator having previously circulated petitions during the 2026 primary nomination process. An expedited briefing and decision are respectfully requested.

Respectfully submitted:
 /s/ Christopher D. Kruger

| | |
|---|---|
| Christopher D. Kruger | Andrew Finko |
| Law Office of Christopher Kruger | 875 N. Michigan Ave. |
| 2022 Dodge Avenue | Suite 3100 |
| Evanston, IL 60201 | Chicago, IL 60611 |
| 847.420.1763 | (773) 480-0616 |
| chris@kruger-law.com | Finkolaw@Fastmail.FM |

### Certificate of Service

I, the undersigned attorney, certify that on April 4, 2026 the undersigned electronically filed the foregoing filing with the Clerk of the District Court, Northern District of Illinois, Eastern Division, using the CM/ECF system, which sends an email with a download link of this filing to all counsel of record.

/s/  Andrew Finko
